Next case is United States v. Pierre Good morning, your honors. May it please the court, my name is Amir Benno. I represent defendant appellant Ralph Pierre in this criminal appeal. As your honors are aware, I think the briefs submitted in this case are fairly comprehensive. I will try to focus on some of I think the more salient issues, the first being that it was ineffective assistance of counsel for the attorney for Mr. Pierre in the district court to fail to move to sever Mr. Pierre's case from that of his co-defendants. In this case, Mr. Pierre was accused and ultimately convicted of money laundering and conspiracy to commit money laundering while the co-defendants were charged with fraud related offenses, wire fraud and mail fraud in addition. Most of the evidence at the trial included the fraud evidence. It was highly prejudicial to Mr. Pierre. It had nothing to do with his charge and his ultimate conviction which focused on the withdrawal of... But isn't it the case that some of, even if Mr. Pierre had been charged or tried separately, some of this evidence of the fraud would still have come in? Well, yes, your honor, in the sense that the government still would have the burden of showing that Mr. Pierre knew that the funds, now he was charged with withdrawing or transacting about $18,000 on a specific date certain, October 11th of 2018, that those funds were illicit or ill gotten. So much of the evidence, however, that was introduced had nothing to do with that. And so not only was there evidence on these frauds involving victims of offenses that had nothing to do with the particular monetary transaction at issue in Mr. Pierre's case, but we also heard admission of a co-defendant, Mr. Thomas, who is not here on appeal today, which was introduced over the objection, a brutal objection of one of the co-defendants. And that statement, as it was sort of diluted or redacted in order to try to meet the Bruton requirements, unfortunately created more confusion and more prejudice for Mr. Pierre because it left him... Was there an objection even after the Brutonized statement, the redacted statement? I believe there was, your honor. If I'm not mistaken, Judge Underhill had said at the outset that if there's an objection by one of the co-defendants, that that would apply for all of them so that they didn't have to duplicate. I do believe that this was objected to at the time that it came in, although I would have to defer to the record on that. In the interest of time, I'll move through and on rebuttal, I can try to address that. But the admission of Rodney Thomas, as I said, points the finger. He ultimately, in the unredacted form, at co-defendant Mr. Fassassi. But when this was changed to meet the requirements of Bruton and we're left just with pronouns of he did this and he did that, the jury could reasonably infer that... I see you're shaking your head, your honor. A shake of a head is neither a question nor a statement, so go ahead. Well, I could reasonably infer that Mr. Pierre was, in fact, the individual who Mr. Thomas was talking about when, in fact, he wasn't. The errors were further compounded in this case because they introduced evidence, I'll move on to the next point, of a photographic identification, an out-of-court photographic identification that was unduly suggestive and was unreliable. There was a hearing, there was a motion, there was a hearing. The judge allowed this testimony to come in over the protest of the attorneys, defense attorneys. But ultimately, the particular postal inspector or letter carrier who identified Mr. Pierre as somebody who received parcels to a location, an address in New Haven, that was sort of the hub. So the idea, so here's the question, so the idea that I think Judge Underhill had in mind, but correct me if you think I'm wrong, was that the post, this particular postal inspector was not an eyewitness in the classic sense, right? She's not an eyewitness to a crime. She goes there every day, it's as if someone was a family member and is shown a photograph, and is that your aunt? Yes. We don't need, in the ordinary course typically, a lineup or a photo array for that. Would you agree with that? I don't agree, Your Honor, respectfully. I think what Judge Underhill was getting at is in the traditional res gestae of a crime, a mugging or something, saying I saw that person wearing a blue hat and that's the person who did it. That's the more typical scenario where we would have sort of this situation. But here, her observations were essential to, for the government to meet its burden of the, of the, of the crimes with which she was charged. It ended up that the testimony she gave, I mean the fact of the out-of-court identification, was very, you know, helped the government prove its case, yes. But at the time the identification procedure was undertaken, was it of a sort, I mean, it was not showing a witness to a crime or the victim of a crime a single photo. It was, attention had not focused on one suspect. So I guess I'm asking the same question to my colleague. In that circumstance, do you really need, you know, fillers or a double blind process? And why? Respectfully, yes, because they had to prove that, that Mr. Pierre knew that the funds that were transacted through his account were illicit. And this is how they proved it. They proved it in two ways. One was saying that he received these parcels. He was this individual, Ray Shaw, who was receiving parcels to an address. Her testimony went directly to connect the nexus between Mr. Pierre and Mr. Shaw. Without that, they had no other evidence. I mean, Mr. Pierre did nothing different than the victims of these crimes, which is his accounts were used as repositories under this money mule scheme to deposit and transact money. Much in the same way, all of these other elderly victims who testified had their accounts used. So this was really the core aspect of the government's case. And so while, yes, it's not the sort of a stick up and I saw somebody getting mugged, it is essential for them to be able to prove the knowingness, the mens rea aspect of the money laundering offense. And so there wasn't here, as you correctly pointed out, a photo array. There were no fillers used in the photographs. If you look at them in the record, you'll see Mr. Pierre looks completely different than everybody else. He's the only individual with a beard. It wasn't double blind. There was suggestive comments by the detective saying, do you see the person essentially who received these parcels at this address? You can't get more suggestive than that. And there were no bigger factors. To the extent that the government wants to say there's an independent source or your honor suggests, listen, she's a letter carrier. She goes there a lot of times. She can say what she observed. They had the duty to introduce evidence as to the independent source. They didn't introduce any of them. It's their duty. They had the burden of proof. They failed to meet it. And then when the judge refused to charge the jury, although there had been a request, as to the suggestive ID, that again was an error that requires reversal in this case. I see I'm out of time. You want to use some of your rebuttal time now or would you like to reserve it till rebuttal? I will reserve your honor. Good morning. May it please the court. My name is Allison Neer and I represent Mr. Fasasi. I've also briefed a number of issues, but I'm going to focus on the sentencing issues, particularly two issues. One, the court's failure to adhere to the prescriptions of Rule 32 about inquiring that both defense counsel and the defendant have reviewed and discussed the pre-sentence report. Because that particular issue dovetails directly with the claim regarding the loss amount. That is a plain error review. There was no objection raised. But part of the problem is no objections were raised to anything. And what's kind of unusual about this case is it's apparent I was not trial counsel and trial counsel was not sentencing counsel. Sentencing counsel incidentally had represented the cooperating witness in the trial and then after a conflict hearing was permitted to represent Mr. Fasasi at the sentencing. And the court had decided the decision of the USB Gates just prior to my filing this brief and emphasized how critical it is that a district judge canvass both the defendant and the attorney on the fact that they have reviewed and discussed the pre-sentence report. Now in Gates, this court determined that there was no substantial prejudice because there was an apparent that the defendant was familiar with it because of specific references in the defendant's remarks. The government cited two other cases, Algaheim and Davila, where again the court concluded that there was no substantial prejudice in Davila. It turns out the counsel had raised objections in the brief, objections that could have only come from information received from the defendant. And Algaheim, the defendant was specifically asked and equivocated about the pre-sentence report. Can I ask you a question? Yes. Do you know if he actually read the PSR? I do not believe that he did. Or discussed it with his lawyer? He did not, Your Honor. And that's not in the record. That's based on my independent inquiries. And so I recognize that could become part of a 2255 down the line. But if Judge Underhill had inquired, particularly when his defense counsel said, oh, he has some minor issues but nothing worth noting, if he just inquired in that moment, it may be that we wouldn't have a plenary review. The defendant, Mr. Fasasi himself, may have had the opportunity to articulate some of the concerns that he had had. Because he was finding out in real time, much like he kind of indicated in his comments. So you are also suggesting that counsel, when counsel stated, I went over the entire report, my client had some, took some issue with just minor details but nothing of substance, that that was false? I don't know. I think that there was an opportunity. Let me put it this way. I think there was a late opportunity to discuss the pre-sentence report not at any time prior to the date of sentencing, is my understanding. So let me follow up with that. If the lawyer discusses the PSR just before sentencing, even on the day of sentencing, and shows the PSR to the client, what is your position? Is that enough under Rule 32? Or is that a failure to comply with Rule 32? Unless the defendant has... Does it have to be meaningful in a meaningful way? He has to have an opportunity to read the entire report and levy any objections. Because I think it relates to the loss amount. And that's kind of a good example of the substantial prejudice that flowed from this. Because sentencing counsel was not trial counsel, or because he hadn't investigated, he did not catch the fact that in the government summary chart for the loss amount, there were significant discrepancies between the loss amounts for particular victims in the chart and the trial testimony. That alone should have been a basis for an objection, and Mr. Fasasi sat through the trial. Mr. Silverstein did not. So, because there was no opportunity to review and discuss the information in the pre-sentence report, there was no opportunity to raise an objection to the loss amount. And because there was no opportunity to raise an objection to what even the government concedes is more than a $400,000 discrepancy between the trial testimony and the government's chart, that raises very serious concerns about the veracity and adequacy of the remaining information that's in the chart. So much so that if you look at four or five witnesses, it turns out there's a $400,000 discrepancy, and you extrapolate that to 123 victims, and all of those are off by some variance of $10,000, $20,000, $50,000. We could legitimately be in a situation where he has moved below that $3.5 million threshold that would take him to a lower offense level. So, Mr. Fasasi did not have the opportunity to fully read and discuss his pre-sentence report. If the district judge had inquired what minor discrepancies are of concern, Mr. Fasasi, did you have an opportunity to review and discuss the pre-sentence report with your counsel, his response would have been no. And because of that, we are in a plain error situation where the government was permitted to put forth a loss chart that, by its own admission, is inconsistent with the trial testimony. And this court actually recently held, after the briefing in this case in Rainford, which is 110 F. 4th, 455, that was actually a loss case where there was plain error review. And this court made a point of saying that even in plain error review, the court still has an obligation to make a record sufficient for appellate review, make sufficient factual findings that this court can make a determination that the court's calculation of the guideline range was correct. And similarly, the government bears the burden by a preponderance of evidence of establishing the loss amount. So, regardless of whether or not there was an objection, I submit that on its face, the government's failed to satisfy its burden to establish a loss amount, particularly given those gross inconsistencies. I see I am out of time. If there are no other questions, I would ask the court to remand this for resentencing with additional fact-finding, particularly on the loss amount. Good morning, Your Honors. Stephanie Levick, Assistant U.S. Attorney for the District of Connecticut, on behalf of the United States. May it please the court. This court should affirm Defendant Farouk Vassassi and Ralph Pierre's convictions and sentences as neither defendant has raised issues sufficient to disturb the jury's verdict or the court's below-guidelines reasonable sentence in this case. The issues before this court are numerous. I will try to address the issues that have come up in the order with respect to each of the defendants, and then happy to answer any questions that the court may have on any of the remaining issues. Maybe you could address first the question of the photo identification procedure. This produced evidence that was useful for the government to establish that Mr. Pierre was the person who was receiving packages. Essentially, the postal inspector was shown or the postal agent was shown just photographs of people that had been shown to be associated with that residence. As your adversary points out, only one of those individuals had a beard. It wasn't that unduly suggestive. I'm having difficulty with the argument that it wasn't. I would make two points with respect to your question. First, the procedure was not unduly suggestive because the protections that are put in place or the procedures that the New Haven Police Department had put in place to guard against essentially unduly suggestiveness were protecting against factors that weren't present when Detective Samaron showed the photos to the mail carrier. The reason for that is a couple of folds. First, she was not a witness to any crime. I guess I'm struggling a little bit with that notion that certainly whether or not a particular type of identifications were required by Connecticut law because of this situation. Maybe it doesn't apply here, but I'm not certain I see what the distinction is because she's not a witness to the crime. That's correct, but her identification did provide what was pretty significant evidence here. Had that identification not come in, the government's case would have looked significantly different, correct? I would disagree with that because while it was significant that the witness identified Mr. Pierre as quote unquote Ray Shaw, an individual who had been receiving packages at that address, the government had also presented evidence that he had received packages in his own name, that he had opened or that he had registered a purported non-profit and then opened four separate bank accounts within two weeks of that non-profit. Does that distinguish – your adversary suggested that that does not distinguish him from some of the other individuals in the house who also were charged, not in this case. I'm sorry. The other individuals who were found to be involved in the fraud, I guess. The fact that he was identified at the residence as Mr. Shaw?  I don't disagree that the evidence that he was signing for packages under a false identity was a significant part of the case. But I do – I would disagree with the point that it was the critical or substantially proved the government's case in this trial because of the overwhelming amount of evidence aside from that small piece that established Mr. Pierre's involvement and knowledge of the money laundering activity. Which included, as I was mentioning, the opening of a purported non-profit which was never actually registered as a non-profit that laundered or transferred over $200,000 through those bank accounts in the course of five or six months. There was no activity in those bank accounts as demonstrated at trial that indicated that the bank accounts or the non-profit was being utilized as a non-profit. There was evidence from the individuals residing at 349 Sherman including Mr. Pierre's roommate who testified about his own involvement in the wire fraud conspiracy and the money laundering conspiracy. And then there was testimony from an individual roommate at the residence who testified that Mr. Pierre and co-defendant Rodney Thomas were constantly fighting over missing packages. So whether or not Ms. McCarroll was able to identify Mr. Pierre as Ray Shaw, another individual who was collecting parcels, or whether the jury would have believed that Ray Shaw was a completely separate individual or perhaps the pseudonym of one of the other co-defendants, does not change that there was overwhelming evidence establishing Mr. Pierre's involvement. So I think, but maybe I've got this wrong, in your brief, the government's brief, with respect to this claim relating to the identification, out-of-court identification by postal inspector, postal worker McCarroll, do you make this harmlessness argument? Which is essentially what I think you're doing? I believe we do because we would argue that, and I believe we argued this and I haven't, I don't know the specific page on which we did it, that there was no prejudice to Mr. Pierre because of the overwhelming evidence in this case. I think you make the more, another argument, which is that by virtue of Judge Underhill's instructions and the fact that Mr. Pierre's counsel was able to make these arguments and effectively cross-examine the witnesses about the identification, that took care of the problem, if there was a problem. Yes, I would, I guess I would go back a step and just, it is our view that the perhaps more critical and dispositive issue with respect to the identification testimony is the fact that Ms. McCarroll's testimony was, or her identification rather, was independently reliable. And so regardless of whether the procedures were correct or unduly suggestive in any manner, that identification testimony was admissible, even notwithstanding any errors on the procedural side, if there were factors that established that the identification was reliable. In other words, was the jury told, here are some of the factors that you should assess or consider in assessing the reliability of that identification? Yes, the jury was instructed to both carefully consider the witness identification testimony and to, in considering the witness identification testimony, to consider the witness's opportunity to view the defendant amongst other factors. It wasn't framed as a Biggers versus Neal list, but the essential elements of what would make an identification inherently reliable were instructed by the court. And so on that ground, there is no prejudice here because any error in the admission of such testimony was cured by the judge's jury instructions on that specific issue. As well as, as your Honor has already indicated, the cross-examination of defense counsel during trial as to the- It's not the best place to be, but okay. Well, I think he was cross-examining the appropriateness of the procedures utilized in eliciting that identification. And just going back to one of the prior questions about whether or not the procedures themselves were suggestive, I would just note that at the time that the detective was conducting the procedure, he himself did not know who lived at that residence. And so often fillers and double blinds are utilized because you don't want law enforcement to subtly signal to the witness who might be the person that they're looking to identify. Here, that wasn't even an issue because the detective testified that he himself did not know who was actually living at that residence, so he could not have possibly signaled to her who the quote-unquote right person would be to identify. She was also a mail carrier for that house. And even if he had some evidence that associated the photographs with the residence, he certainly had no basis for preferring one or another as to who was receiving packages. Correct, because this was the very, very early stages of the investigation where they were trying to establish whether a crime was even occurring. There was some suspicious activity at this residence, namely the high volume of parcels going there, but that in and of itself, signing for a package, is not a crime. And that just goes back to the earlier point that this victim, or I'm sorry, not victim, I shouldn't say that, this witness did not witness a crime. She witnessed a fact that is incident to the crime that was ultimately revealed through the investigation, but signing a package in and of itself or living at a residence is not, at least in this particular case, in and of itself, a crime. She was, the record didn't appear crystal clear on this, but it looks like she may have been told, do you recognize any of these people delivering packages to them at that residence? So her attention was focused on that particular residence, not on her route broadly. Am I right about that? So the record is a little bit unclear as to the specific question that Detective Zamorin posed to the witness. I think he had testified at one point that he had asked if she recognized any of these individuals as individuals she delivered to in her route. And then I think in response to a question posed by the government, he responded in the affirmative when asked whether he had asked her to identify individuals who she delivered to at 349 Sherman. So I suppose there is some suggestiveness in that these were people, she was tuned into the people that she might have been delivering to at a particular residence. But again, he did not know whether any of those people lived at that residence. And the testimony at trial was that this was a party house in which there were numerous people residing. It was multi-story and multi-apartment, and so it's not the case that these were necessarily individuals who were residing there. Could you address the discrepancies between the loss amounts and the observations in the PSR between Exhibit A and the PSR itself as to these three discrepancies? You acknowledge them but don't offer an explanation in your briefing. So what are we to make of that in terms of the extent to which the defendant had an opportunity with counsel to go over the PSR and the reliability of the sentencing procedure? I just want to clarify and understand the question. Is the question, what was the reason that there was a discrepancy? Do we know? I don't think we have a nailed down answer as to why there was a discrepancy. The best answer I could provide is that the witnesses, when they first reported their losses, may have been working off their memory or some sort of estimate of what their losses were. And as we went through the trial process and prepared each of the witnesses, obtained bank records and specific dollar amounts of money flowing that might have accounted for it. I think the other thing to remember here is that the money laundering and the fraud involved a lot of cash. And so victims were sending cash in the mail to these defendants and other co-conspirators. And it is just difficult, I think, in that sense to account for every dollar that has been transferred, unlike a wire or a cash app or some sort of Venmo payment. On the loss amounts, though, I think . . . well, maybe I'll at this point address the Rule 32 argument here. The record is clear that Judge Underhill had asked the defense counsel . . . I'm sorry. Could I just take you back just for a second? Yes, of course. So I guess I'm just wondering, given the discrepancies in the charts as to the testimony, the victims who, I guess, testified, if the total loss amount is also based on 123 additional victims, how are we to have confidence in the ultimate calculations that were put forth by the government? I guess I would answer that in a couple ways. The first is that the court was not required to calculate a precise number. In calculating a loss amount, it is either the reasonable estimate of the actual or intended loss. And so that number could be pretty widespread, especially if you are going off an intended loss amount. Here we had gone off what we believed was an actual loss amount based on victim statements and victim interviews, as well as what we had found during the course of our investigation. And so I guess my response to that is that the court was not required to find to the specific dollar or penny what the loss was. And there was no error in applying a loss amount that was an estimate based on the evidence that was available. And I think the second response would be that the defendant waived this at sentencing. He had multiple opportunities to object to the loss amount, including at sentencing or in his objections to the PSR. And so this is not a forfeiture claim. This is a waiver. Well, it's a combination of a waiver and a possible ineffective assistance of counsel claim. Do you agree with that? Well, ineffective assistance of counsel potentially in a separate matter, but that's not the issue that is before this court. The issue before this court is whether there was any error committed by the court when it didn't ask Mr. Well, I take that back. When it allegedly did not sufficiently canvass the defendant on his review of the PSR and whether or not there was any error in the calculation of loss. And on that, I would posit that there was no error and that this issue on this appeal was in fact waived because he very clearly said in response to the court that they had reviewed the PSR, that he went over the entire report and the client had taken some issue with just some minor details, but nothing of substance, which would suggest to me at least that he did review the PSR with his client. Whether or not the court inquired as to how much detail he had gone into it with his client or whether they had reviewed every page and every line, that is not required of the court to canvass the defendant on that. So in many respects, the PSR is maybe the most important component, document of a component of a sentencing. Would you agree with that? It is, yes, I would probably agree that that is maybe the important or at least one of the more important documents at sentencing. So having agreed with that, would you also agree that it's critical under Rule 32 that a sentencing judge make sure that the defendant see the critical document that's going to be a part of sentencing that defendant? I would agree that it is important for the court to ensure that that has happened, and here the court did. I think that the court met its Rule 32 obligation by asking the defense not once but twice whether they had an opportunity to review and discuss the PSR. I don't think the court is under any sort of obligation to further inquire as to the details of the communications between the defense and his lawyer, the defendant and his lawyer. And so I think the Rule 32 obligation is met. Otherwise, sentencing procedures would go on for hours if the court was required to ensure that every defendant had gone through every page with his lawyer. I think the court was entitled here to accept the representation of defense counsel at sentencing. And so unless the court has any further questions, the government would rest on its written submissions and respectfully request that this court affirm the judgments in this case as to both defendants. Your Honor, to address the court's question at first, it does not appear that Mr. Peer's lawyer below actually objected on the Bruton issue. I think you had asked me that question when I was up before. However, Mr. Fasasi's attorney did, and Judge Underhill had said that one objection by one of the participants is sufficient. And I also note that Mr. Fasasi's had moved to sever on the basis that my client, Mr. Peer, was essentially another prosecutor pointing the finger at Mr. Fasasi saying, I've been duped by this guy. And so this was all before the court. It's properly before this court now about the severance and the Bruton issue. As to the photo ID, I've heard counsel for the government say that this letter carrier was not a witness to a crime. I respectfully disagree with that characterization. She was, in fact. The whole argument is that these receipts of parcels to this home in New Haven was part of the conspiracy to commit mail fraud and to receive illicit money from individuals to this house. To the extent that he was deemed to be racial, this is a crime. Whether it's the crime he was charged with or not, or whether he's a conspirator or alleged to be, it is a crime. The government argues that while there was overwhelming evidence, they did not, by the way, make the argument of harmless error. I do not believe, Your Honor, below. They did argue in the legal sufficiency point that there was other evidence. But they didn't argue in response to the suggestive ID that there was this harmless error. I don't believe they did anyway. But the argument that he, Mr. Pierre, had received packages in his own name, he opened bank accounts, is no different than any of. It's actually the victims, Judge. I was saying Mary Thal, Donna Cohen, Donna Weissman, Judith Martin, Dorothy Allen. All of these different individuals whose testimony was elicited saying that they had opened accounts, they had deposited money into their own accounts, they had written checks and sent them elsewhere. This is exactly what Mr. Pierre was charged with. The same things that the victims are said to have been done to them. The only difference with Mr. Pierre is that they were saying that he knew that these were ill-gotten gains because he was Ray Shaw who received this material. And the government's argument that, well, he lived in a house where all this stuff was going on, is contradicted by their other assertion that this is a party house. People are coming and going all the time. You can't have it both ways. If it's a party house and you don't know who the people are, you can't say that, well, I know that this person living next to me is- One of the arguments that was also made was not quite harmlessness. I'll agree with you on that. But that it was cured. Cured by the fact that there was an instruction given to the jury about the reliability of the out-of-court identification by McCarroll. And cured also in one sense, and you can take it for what it's worth, by the ability of defense counsel to cross-examine on the out-of-court identification. Well, counsel submitted their request to charge as to this suggestive ID, and that was rejected by the court. It was not given to the court. Yes, there was cross-examination. But, you know, I would just like to address the fact that just because Mr. Pierre lived with other people doesn't- In fact, I would argue that there's an inference that that makes him an easier target for Mr. Fasasi and the others. They don't have to go online onto these websites to try to draw him in. Here's a guy who, hey, I can just walk next door and knock on his door. Can you open this bank account for me? And ask him to do it. The testimony was, by the way, even though people were saying that there was fighting over packages, was never about Mr. Pierre fighting over packages. And there was no evidence introduced that people knew what was in the packages. And if they did know what was in the packages, i.e. money, that they knew where that money came from. In fact, the only testimony as to money was that Mr. Fasasi said it came from business. But that's as far as it got. And nobody knows what business means. So, finally, I would just- I see I'm out of time. If I may have ten seconds, Your Honor, just to wrap up. Which is, the prejudice to Mr. Pierre was compounded by the fact that the government also sought to introduce, on their case in chief, this very prejudicial testimony from Mary Tholl, who was a victim in this case. Which had nothing to do with any of the elements of any of the crimes that they had the burden to prove on. That her- she was financially devastated. That her sister had multiple sclerosis. That her brother was- she couldn't take care of her special needs brother anymore. And they make this argument on appeal, saying, well, we had to sort of preemptively argue against the defense. Raising this argument that Mary Tholl was part of the conspiracy. Which was never even a defense in this case. Mary Tholl, by their own evidence, is the one who went to the federal authorities to report Antonio Bonito to law enforcement. So, they introduced highly prejudicial, inflammatory evidence when added to the other errors that were done evidentiary-wise in this case. Suffice to unduly prejudice Mr. Pierre. So, I would ask your honors to reverse this conviction. And upon reversal and remand that the case be dismissed. Respectfully, if the government, either at sentencing or today, cannot articulate the basis for that loss chart. It has not met its burden. Whether or not there was an objection from Mr. Fasasi or not. The failure to raise an objection does not change two things. It doesn't change the government's obligation to prove by a preponderance of the evidence the loss amount. This is not an estimated loss case. This is a chart with millions of dollars down to the penny. And even today, the government cannot tell us what that is based on. We don't know when that chart was created. We don't know what it's based on. How do we get around this waiver issue? It's an affirmative waiver. It's not just a failure to object. Because I think looking back, your honor, on the case I mentioned earlier, the Raishford case from this court. That was a plain error case. And this court acknowledged that that doesn't change the fact that the district court still has an obligation to make factual findings appropriate for appellate review. There are no factual findings about the loss amount. And although the government suggests, well, you know, if he'd raised an objection at the time, perhaps we could have provided the underlying documentation. But sitting here today, I still don't know what that documentation would be. If the government can't articulate why there is a discrepancy between the trial testimony and the loss amount that was fundamental to the sentencing, the primary driver of the guideline range, then how can this court properly review what was decided below? This is exactly why the government bears this burden. And this is why the trial court's obligation about factual findings doesn't go away, even in the context of plain error review. You know, the fact that there is a conversation about, you know, we don't know, maybe this had cash involved. You know, maybe this was before we prepared them for trial. Those are answers that the court should have made findings on at the time of sentencing, regardless of whether or not there was an objection. And I would just say briefly on the Rule 32 issue, your honor, the court doesn't need to take hours to ask a defendant if he has had a meaningful opportunity to review and discuss the pre-sentence report. And in fact, the district judges often do specifically direct that question to defendants. Did you have a meaningful opportunity to review and discuss the most important document pertaining to your sentencing? That would take 30 seconds. And the failure to do that here caused substantial prejudice to Mr. Fasasi, such that even on a plain error analysis, the case should be remanded. I have also raised issues related to the underlying trial, so we'd ask the court to reverse and remand for a new trial. I previously said just for sentencing, for a new trial, or at a minimum for a new sentence. Thank you. Thank you all, and we will take the matter under advisement.